# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER RAPALO, | ) 1:11-cv-01695-LJO-BAM (PC) |
| Plaintiff, | ) FINDINGS AND RECOMMENDATIONS |
| | ) RECOMMENDING DEFENDANTS  LOPEZ |
| v. | ) AND MANASRAH'S MOTION FOR |
| | ) SUMMARY JUDGMENT BE GRANTED |
| S. LOPEZ, et al., | ) |
| Defendants. | ) (ECF No. 94) |
| | ) **FOURTEEN (14) DAY DEADLINE** |
| | ) |
| | ) |

## <u>Findings and Recommendations</u>

### I.      Introduction

Plaintiff Walter Rapalo ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983, against Defendants Lopez, S. Schaefer (erroneously sued as Schaffer) and Manasrah for deliberate indifference to serious medical needs in violation of the Eighth Amendment to the United States Constitution.

Currently before the court is Defendants Lopez and Manasrah's motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56.[1] (ECF No. 94.) Plaintiff opposed the motion (ECF Nos. 114, 115, 116, 117), and Defendants Lopez and Manasrah replied (ECF

---

[1]      Concurrent with the motion, Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment.  (ECF No. 94-1); *See Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1988); *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

No. 119).  Plaintiff also submitted a surreply.  (ECF No. 122).  The motion is deemed submitted. Local Rule 230(l).

## II.    Plaintiff's Surreply

As noted above, Defendants Lopez and Manasrah filed a motion for summary judgment, Plaintiff responded and Defendants replied.  Thereafter, on April 15, 2016, Plaintiff filed a response to Defendants' reply.  (ECF No. 122.)  This court's Local Rules provide for a motion, an opposition, and a reply. Local Rule 230(1). Neither the Local Rules nor the Federal Rules of Civil Procedure provide the right to file a response to a reply. *See*, *e.g.*, *Wyatt v. Zanchi*, No. 1:09-cv-01242 BAM PC, 2011 WL 5838438, at *5 (E.D. Cal. Nov. 21, 2011).  In this case, the court neither requested a response to Defendants' reply nor granted a request on Plaintiff's behalf to file such a response.  Accordingly, the court will recommend that Plaintiff's response to Defendants' reply be stricken from the record and not considered for purposes of summary judgment.

## III.   Defendants' Motion for Summary Judgment[2]

Defendants Lopez and Manasrah argue that (1) there is no evidence to support Plaintiff's claims against them for deliberate indifference to his medical needs in violation of the Eighth Amendment; and (2) Defendants Lopez and Manasrah are entitled to qualified immunity.  For the reasons explained below, the court recommends granting Defendants' motion for summary judgment.

### A.    Legal Standard

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty*

---

[2]      By separate order, the Court has recommended denial of Plaintiff's motion for appointment of a neutral expert and denial of Plaintiff's motion to strike the declarations of Dr. Bruce Barnett submitted in support of the motions for summary judgment filed by Defendants Lopez and Manasrah and by Defendant Schaeffer.  (ECF Nos. 100, 125.)  In the interest of judicial economy, the Court finds it unnecessary to reiterate its reasoning here, and will proceed consistent with the recommendations to deny Plaintiff's motion for appointment of a neutral expert and to deny Plaintiff's motion to strike the declaration of Dr. Bruce Barnett submitted in support of Defendants' motion for summary judgment.

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Id.* (citing *Celotex*, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.*

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted).  "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn

in [its] favor." *Anderson*, 477 U.S. at 255.  Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this court did not consider the argument, document, paper, or objection. This court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**B.   Undisputed Material Facts**[3]

1.   Plaintiff was seen by a prison doctor on April 25, 2005, for a complaint of back pain and muscle spasm that he reported having suffered from for a long time.  (Doc. 95, Ex. A to Declaration of Ratliff ("Ratliff Decl."), CDCR 00974.)

Plaintiff objects that the background facts from the years prior to his treatment by Defendants are irrelevant.  This objection is overruled.  Facts related to Plaintiff's back injury, diagnoses, treatment and treatment recommendations provide relevant background information regarding Plaintiff's condition prior to his treatment by Defendants Lopez and Manasrah.  As discussed more fully below, the treatment recommendations for Plaintiff's back prior to his transfer to Kern Valley State Prison ("KVSP") are critical to his claim that Defendants Lopez and Manasrah were deliberately indifferent to his need for back surgery or neurosurgical consult.

2.   Nevertheless, Plaintiff reported doing 400 pushups and the "bars" 400 times.  (*Id.*)

3.   Plaintiff was prescribed Tylenol and Robaxin, was instructed not to engage in sports and exercise for 90 days, and an x-ray of his lumbosacral (LS) spine was ordered.  (*Id.* at CDCR 00832.)

4.   The x-rays of Plaintiff's lumbar spine were performed on May 4, 2005, and the

---

[3]   These undisputed material facts are derived from Defendants Lopez and Manasrah's Separate Statement of Undisputed Facts in Support of Their Motion for Summary Judgment.  (ECF No. 94-3).  Unless otherwise indicated, disputed material facts and immaterial facts are omitted from this statement, and relevant objections are overruled.

1    results were normal.  (*Id.* at CDCR 00037.)

2        5.      On February 16, 2006, Plaintiff was again seen by a doctor and complained of

3    lower back pain that had been present for a long time.  (*Id.* at CDCR 00725.)

4        6.      Plaintiff complained that treatment did not help.  (*Id.*)

5        7.      Nevertheless, Plaintiff reported doing 500 push-ups three times per week, the

6    "bars" 200 times three times a week, and doing 300 crunches three times per week. (*Id.*)

7        8.      It was noted that the x-ray of the lumbar spine had been normal.  (*Id.*)

8        9.      An examination found that he had no paraspinal spasms and that there was no

9    pain with flexion, extension, flexion to the right or left, or with rotation of the lumbar spine.

10    (*Id.*)

11       10.     He was diagnosed with low back pain secondary to athletic activity.  (*Id.*)

12       11.     Plaintiff was again instructed to decrease his exercise and was also prescribed

13    Prednisone.  (*Id.* at CDCR 00832)

14       12.     Having transferred to the Florence Corrections Center ("FCC") in Arizona,

15    Plaintiff was then seen by a doctor on September 22, 2008, complained of low back pain

16    radiating to his left leg, and was diagnosed with lower back pain and sciatica.  (*Id.* at CDCR

17    01043-44.)

18       13.     Plaintiff was prescribed Naprosyn.  (*Id.*)

19       14.     On October 18, 2008, Plaintiff was seen by a doctor at FCC and reported that he

20    had been suffering from intermittent lumbar back pain since an automobile accident five years

21    earlier.  (*Id.* at CDCR 01042-43.)

22       15.     Plaintiff complained that the pain used to resolve for periods of time but was

23    getting worse and was now constant.  (*Id.*)

24       16.     An examination found that he had full range of motion, there were no muscle

25    spasms, and he ambulated without difficulty.  (*Id.*)

26       17.     Plaintiff was diagnosed with probable compression sciatic nerve palsy on the left.

27    (*Id.*)

28       18.     Plaintiff was prescribed Ibuprofen and Cyclobenzaprine.  (*Id.*)

19.     Plaintiff was to have a follow-up in three weeks and an x-ray of his lumbar spine. (*Id*.)

20.     On November 4, 2008, the x-ray of Plaintiff's lumbar spine was completed.  (*Id*. at CDCR 01060.)

21.     The x-ray showed narrowing at the L5-S1 vertebrae but no acute changes.  (*Id*.)

22.     Plaintiff was seen again for a follow-up on November 11, 2008.  (*Id*. at CDCR 01040-41.)

23.     An examination showed full range of motion, no muscle spasms, and that he ambulated without difficulty.  (*Id*.)

24.     Plaintiff's recent lumbar spine x-ray was viewed as normal. (*Id*.)

25.     Plaintiff was diagnosed with probable compression sciatic nerve palsy on the left. (*Id*.)

26.     An MRI was ordered. (*Id*.)

27.     There was no need for surgery at this time in light of Plaintiff's normal examination and function.  (ECF No. 94-5, Declaration of Barnett ("Barnett Decl.") p. 5.)

Plaintiff attempts to raise a dispute by arguing that the treatment notes do not specifically state "no need for surgery."  (ECF No. 115 at p. 2.)  Although Plaintiff correctly identifies that the treatment notes do not include a statement regarding "no need for surgery," he has not presented expert testimony in response to Dr. Barnett's opinion that there was no need for surgery.  Further, Plaintiff admits that "surgery could not be determined yet," which confirms that surgery was not recommended or required at that time.

28.     Plaintiff's MRI was performed on November 26, 2008, and it found narrowing and herniation at the L5-S1 disc causing the nerve to be pinched.  (Doc. 95, Ex. A to Ratliff Decl., CDCR 01052.)

29.     An MRI finding that shows disc herniation does not compel surgery.  (Barnett Decl. at p. 5.)

Plaintiff argues that Dr. Barnett misstates the medical record because a clinic note dated December 3, 2008 recommended follow-up with Dr. Hegmann, and the follow-up with Dr.

Hegmann resulted in a note for "Consult-Offsite" "Neurosurgery for L5-S1 lt disc herniation with significant symptoms." (ECF No. 115 at pp. 2-3; Ex. A to Ratliff Decl. at CDCR 01039.) Plaintiff has not raised a genuine dispute of material fact. First, Plaintiff has not provided expert testimony to challenge Dr. Barnett's expert opinion that disc herniation does not compel surgery. Second, and more importantly, the referral for an offsite consultation with neurosurgery does not result in an inference that surgery was compelled by Plaintiff's disc herniation in the absence of any order for back surgery by the consulting neurosurgeon.

30.   Imaging studies alone do not correlate with the severity of the symptoms. (Barnett Decl. at p. 5.)

31.   Most patients with disc herniation will improve within three to four weeks. (Barnett Decl. at p. 5.)

Plaintiff objects that this statement is irrelevant. Plaintiff's objection is overruled. Dr. Barnett's opinion that most patients with disc herniation will improve is relevant to whether or not Plaintiff's disc herniation compelled surgery.

Plaintiff also argues that Dr. Barnett's opinion supports Plaintiff's claims because his complaints lasted longer than four weeks and a diagnosis of chronic back pain was repeatedly given. That Plaintiff's complaints may have continued or that he was diagnosed with chronic back pain does not raise a genuine dispute of fact or raise an issue for trial as to how most patients with disc herniation improve or whether he required surgery for his back.

32.   Medications, including non-steroidal anti-inflammatory drugs (e.g., Ibuprofen), may ameliorate the discomfort and physical therapy can also be helpful. (Barnett Decl. at pp. 5-6.)

33.   On December 8, 2008, Plaintiff had a follow-up with his doctor at FCC and reported that his current medications were controlling his pain adequately. (Ex. A to Ratliff Decl. at CDCR 01050.)

34.   They discussed the MRI results and there were no new findings in a physical exam. (*Id.*)

Plaintiff attempts to raise a dispute by arguing that his doctor ordered a neurosurgery

consult and the lack of new findings does not mean that his condition was better.  (ECF No. 115 at p. 3.)  Plaintiff's argument does not raise a genuine dispute of fact that he discussed the MRI results and that there were no new findings during the physical examination.

35.     The diagnosis remained probable compression sciatic nerve palsy on the left.  (Ex. A to Ratliff Decl. at CDCR 01050.)

36.     The doctor ordered a follow-up in one month and referred him for a consult with neurosurgery.  (*Id.*)

37.     The doctor did not order surgery.  (*Id.*)

38.     Instead, the doctor was considering a neurosurgical consultation toward doing neurosurgery if Plaintiff continued to have significant symptoms arising from the apparent disc herniation seen on the MRI.  (*Id.*; Barnett Decl. at p. 6.)

Plaintiff argues that this is a misstatement of his medical record because the doctor's progress note states "Consultation … Neurosurgery for L5-S1 left disc herniation with significant symptoms."  (ECF No. 115 at p. 4; Ex. A to Ratliff Decl. at CDCR 01050; Barnett Decl. at p. 6.)  Plaintiff's argument does not raise a genuine issue for trial and confirms that his doctor ordered a neurosurgical consultation for Plaintiff's disc herniation and significant symptoms.

39.     Plaintiff was seen for a follow-up on January 2, 2009.  (Ex. A. to Ratliff Decl. at CDCR 1048-49.)

40.     Plaintiff reported that he was about to be transferred back to prison in California. (*Id.*)

41.     Plaintiff stated that the Tramadol helped a lot with the back pain.  (*Id.*)

42.     Plaintiff reported that, with certain movements, there was pain with radiculopathy into the lower left leg.  (*Id.*)

43.     The physical examination of his back found full flexion with minimal discomfort and full range of motion.  (*Id.*)

44.     Plaintiff was diagnosed with chronic back pain due to disc herniation but it was noted that he was actually having less pain than previously.  (*Id.*)

Plaintiff argues that his diagnosis is repeatedly chronic back pain, that there is still an order for neurosurgery consultation, and that less pain at one point with medication does not mean that the condition is no longer there.  (ECF No. 115 at p. 4.)  Plaintiff's arguments do not raise a genuine dispute of fact that he was diagnosed with chronic back pain and that he was actually having less pain at that time.

45.   Plaintiff was cleared to be transferred back to California and was instructed to inform the CDCR that he will "need f/u with neurosurgery."  (Ex. A to Ratliff Decl. at CDCR 01050.)

46.   Plaintiff was then seen by a nurse on January 5, 2009, and reported that he was not experiencing any problems at that time, that he was taking his medication, and that he was feeling good.  (*Id.* at CDCR 01035.)

47.   That his symptoms had significantly improved or virtually resolved was consistent with expectations that most lumbar herniation symptoms resolve spontaneously.  (*Id.*)

Plaintiff argues that the medical record does not state that his back problem had resolved.  Plaintiff's argument does not raise a genuine dispute of material fact.  (ECF No. 115 at pp. 4-5.)  The record reflects Plaintiff's report that he was not experiencing any problems, consistent with Dr. Barnett's opinion that Plaintiff's symptoms had improved or resolved.  (Ex. A to Ratliff Decl. at CDCR 01035.)  Plaintiff has not presented expert testimony to counter Dr. Barnett's expert opinion.

48.   Plaintiff arrived at KVSP on January 7, 2009.  (*Id.* at CDCR 00742.)

49.   Plaintiff was then seen by a doctor on January 14, 2009.  (*Id.* at CDC 00940.)

50.   An examination of his back found no tenderness and a normal range of movement.  (*Id.*)

51.   The plan was to continue him on Ibuprofen and Elavil.  (*Id.*)

52.   On June 12, 2009, Plaintiff was seen by medical staff regarding a complaint of epigastric pain.  (*Id.* at CDCR 00924.)

53.   It was noted that he was suffering from back pain and the plan was to address the issue in six weeks.  (*Id.*)

54.     On July 23, 2009, Plaintiff submitted an inmate appeal (log number KVSP-34-09-12817) alleging that his appointment to see a doctor in March 2009 was cancelled and not rescheduled.  (*Id.* at CDCR 00030.)

55.     Plaintiff requested a referral for another MRI, pain medication and back surgery. (*Id.*)

56.     On August 31, 2009, he was seen by Dr. Huang regarding his lower back pain. (*Id.* at 00912.)

57.     Plaintiff requested Tramadol and wanted the Amitriptyline to be discontinued because he claimed it was not working.  (*Id.*)

58.     An examination found him in no apparent distress, he ambulated without any problem, he had full range of motion in his back, and his flexion/extension was normal.  (*Id.*)

59.     There was no neurological deficit and no radiculopathy.  (*Id.*)

60.     Plaintiff was diagnosed with lower back pain and the plan was to continue Motrin and discontinue Amitriptyline, with a follow-up as needed.  (*Id.*)

61.     In response to Plaintiff's inmate appeal, he was interviewed by Nurse Grewal on September 22, 2009.  (*Id.* at CDCR 00021.)

62.     Nurse Grewal noted that Dr. Huang discontinued his Amitriptyline as Plaintiff requested and ordered that Ibuprofen be continued to help with the pain.  (*Id.*)

63.     Nurse Grewal also noted that Dr. Huang did not deem it medically necessary to order the MRI at that time.  (*Id.*)

Plaintiff argues that Dr. Huang does not state that an MRI was not medically necessary. While correct, Dr. Huang did not order an MRI.

64.     Plaintiff was informed that treatment decisions are at the discretion of the physician based on medical judgment, and are not subject to an inmate's preference.  (*Id.*)

Plaintiff argues that it was not his preference for care, but prior physician's order from FCC to let CDCR know to follow-up with neurosurgery.  Plaintiff's argument does not raise a genuine issue for trial as there is no dispute that treatment decisions are at the discretion of the physician, not the inmate.

65.   On September 28, 2009, Plaintiff was seen by Dr. Huang for a follow-up regarding his lower back pain.  (*Id.* at 00904.)

66.   Plaintiff complained that the Motrin was not helping and he wanted Tramadol. (*Id.*)

67.   His examination, though, found he was in no apparent distress and that he ambulated well without pain.  (*Id.*)

68.   Plaintiff's back had full range of motion and there was no problem with flexion/extension/rotation.  (*Id.*)

69.   Plaintiff was diagnosed with low back pain, and based on the examination, the plan was to continue Motrin, not prescribe Tramadol, and to follow-up as needed.  (*Id.*)

70.   Dr. Huang determined that Plaintiff's request to be prescribed Tramadol was not medically warranted.  (*Id.*; Barnett Decl. at p. 10.)

71.   Tramadol (brand name Ultram) is a synthetic opiate commonly subject to abuse by narcotic addicts and chronic pain patients.  (Barnett Decl. at p. 11.)

72.   Because of that, and Plaintiff's documented history of prior drug abuse, it was appropriate for Plaintiff's medical providers to exercise great caution before prescribing Tramadol.  (*Id.* at pp. 10-11.)

73.   Plaintiff has another follow-up with Dr. Huang on October 27, 2009, regarding his back pain.  (Ex. A. to Ratliff Decl. at CDCR 00897.)

74.   Plaintiff complained of back pain when he exercised, but reported no weakness, no radiation of the pain, and no pain with ambulation.  (*Id.*)

75.   An examination found that he was in no acute distress and that he ambulated well. (*Id.*)

76.   Plaintiff's back had full range of motion, was not tender to palpation, there were no neurological deficits, and radicular symptoms.  (*Id.*)

77.   Plaintiff was diagnosed with lower back pain and the plan was to continue with non-steroidal anti-inflammatory drugs and to add Robaxin.  (*Id.*)

78.   On October 30, 2009, Plaintiff was interviewed by Dr. Schaefer regarding his

inmate appeal in which he complained that his back hurt and he requested that he be provided with a lower back support belt.  (*Id.* at CDCR 00026-27.)

79. The appeal was partially granted by Dr. Schaefer in that a chrono for a back brace was submitted.  (*Id.*)

80. On December 14, 2009, Plaintiff was seen by Dr. Shittu regarding chronic back pain.  (*Id.* at CDCR 00888.)

81. Plaintiff reported the pain was worse with movement, there was occasional radiation to the left leg, and no weakness in extremities.  (*Id.*)

82. An examination found mild tenderness of the lower lumbar spine with normal range of motion.  (*Id.*)

83. Plaintiff was diagnosed with chronic lower back pain and the plan was for Tylenol and Robaxin.  (*Id.*)

84. On January 26, 2010, Plaintiff's inmate appeal was partially granted at the second level of review by Defendant Lopez.  (*Id.* at CDCR 00019-20.)

85. Defendant Lopez was the Chief Medical Officer at KVSP.  (*Id.*)

86. As a physician executive with oversight duties, Defendant Lopez did not provide direct patient care and she never saw Plaintiff.  (*Id.*)

Plaintiff attempts to raise a genuine issue for trial by arguing that Defendant Lopez reviewed the medical records and had the authority to grant the appeal regarding the prior physician's orders and that he be sent to neurosurgery/consultation.  (ECF No. 115 at p. 6.) Plaintiff's argument does not raise a genuine issue or dispute of fact that Defendant Lopez did not provide direct patient care and that she never saw Plaintiff.

87. Plaintiff had complained that he was not afforded the opportunity to request an MRI to determine the extent of degenerative disc disease he had and that he needed pain medication.  (Ex. A to Ratliff Decl. at CDCR 00019-20.)

88. A review of his medical chart showed that he had been prescribed the anti-inflammatory Ibuprofen and the muscle relaxant Robaxin.  (*Id.*)

89. Defendant Lopez also noted that an x-ray had been ordered, but an MRI had not

been found to be medically warranted.  (*Id.*)

Plaintiff argues that Defendant Lopez and KVSP physicians consistently failed to consider the FCC doctors' recommendations and findings and are selective on what they use to state not medially indicated.  (ECF No. 115 at p. 6.)  Plaintiff's argument does not raise a genuine issue for trial regarding the findings of KVSP physicians that an MRI had not been found medically warranted.

90.    Defendant Lopez also denied the request for surgery as there was no indication in the medical chart that surgery was medically indicated at that time.  (Ex. A. to Ratliff Decl. at CDCR 00019-20.)

Plaintiff argues that Defendant Lopez and KVSP failed to consider FCC doctors' reports and findings of the MRI results, which medically indicated neurosurgery/consultation.  (ECF No. 115 at p. 6.)  Plaintiff's argument does not raise a genuine dispute of material fact.  At best, FCC doctors recommended a neurosurgery consultation in 2008, not surgery.  KVSP physicians did not find surgery to be medically indicated in late 2009.

91.    Because none of Plaintiff's treating physician at KVSP at this time had recommended Plaintiff be considered for surgery, Defendant Lopez would have had no reason to offer surgery.  (Ex. A. to Ratliff Decl. at CDCR 00019-20.)

Plaintiff again attempts to raise a genuine dispute by arguing that Defendant Lopez and KVSP physicians failed to consider the prior physician's orders for neurosurgery/consultation. (ECF No. 115 at p. 7.)  As stated, Plaintiff's argument does not raise a genuine dispute of material fact.  At best, FCC doctors recommended a neurosurgery consultation in 2008, not surgery.  KVSP physicians did not find surgery medically indicated in late 2009.

92.    Modern medical practice favors conservative measures for treating chronic lower back pain, rather than surgical treatments of dubious effect and certain risk.  (Barnett Decl. at p. 17.)

93.    It is dangerous and ill-advised to perform surgery based upon professed symptoms despite adequate functional capacity.  (*Id.* at p. 20.)

94.    Patients with lumbar disc herniation undergoing surgical treatments have similar

1  outcomes as patients receiving non-surgical care.  (*Id.* at pp. 20-21.)

2      95.    Plaintiff has no documents showing that surgery was refused because of cost.

3  (ECF No. 94-4, Ex. A to Declaration of Wilson, Deposition of Rapalo 27:11-22.)

4      96.    Plaintiff was seen by a physician's assistant on February 24, 2010.  (Ex. A to

5  Ratliff Decl. at CDCR 00879.)

6      97.    The plan was for an x-ray of the lumbar spine, and follow-up in four to six weeks.

7  (*Id.* at CDCR 1079.)

8      98.    The lumbar x-ray was performed on February 26, 2010, and the results were

9  normal.  (*Id.* at CDCR 00035.)

10      Plaintiff argues that x-rays do not show everything, which is why the neurosurgeon that

11  Plaintiff later saw ordered an MRI.  Plaintiff's argument does not raise a genuine dispute of

12  material fact.  The x-rays of Plaintiff's lumbar spine completed on February 26, 2010, were

13  normal, and a subsequent order for an MRI does not implicate the results of the x-rays.

14      99.    Plaintiff had a follow-up with the doctor on May 10, 2010, regarding his

15  complaints of chronic lower back pain.  (*Id.* at CDCR 00873.)

16      100.    It was noted that his x-ray of the lumbar spine had been normal and a lower back

17  examination found full range of motion.  (*Id.*)

18      101.    The plan was Motrin as needed, he was given a back exercise sheet, and he was to

19  have a follow-up.  (*Id.* at 00873, 01756.)

20      102.    On December 15, 2010, Plaintiff was seen again by a doctor regarding his

21  complaints of back pain.  (*Id.* at 00856.)

22      103.    It was noted that Plaintiff could get up easily without signs of pain or facial

23  grimacing.  (*Id.*)

24      104.    Plaintiff was diagnosed with lower back pain due to his complaints, but there

25  were no objective signs of pain.  (*Id.*)

26      105.    Since his previous MRI was nearly four years old, the doctor determined that

27  Plaintiff would need a new one before being considered as a possible candidate for surgery.  (*Id.*)

28      106.    If Plaintiff was better, he might not need to see neurosurgery anymore.  (*Id.*)

107.     Plaintiff was prescribed Tylenol and order was given for an MRI.  (*Id.*)

108.     The MRI was performed on December 27, 2010.  (*Id.* at 00033.)

109.     It was found that there was a possible disk herniation (left posterior focal extrusion) of the L5-S1 disk.  (*Id.*)

110.     These MRI findings are not alarming and the results, by themselves, are not sufficient to justify the substantial risk of undergoing surgery.  (Barnett Decl. at p. 12.)

Plaintiff attempts to dispute Dr. Barnett's expert opinion by arguing that doctors at FCC, CCI and VSP all recommended neurosurgery/consultation.  (ECF No. 115 at p. 7; Ex. A. to Ratliff Decl. at CDCR 00162, 00176 and 01050.)  Plaintiff fails to raise a genuine dispute of material fact.  Plaintiff's reference to FCC's recommendation for a neurosurgery consultation is not competent evidence to dispute Dr. Barnett's opinion that the MRI findings in December 2010 were not sufficient, by themselves, to justify the risk of surgery.  (Ex. A. to Ratliff Decl. at CDCR 01050.)  Further, Plaintiff's referral in October 2012 for a neurosurgery evaluation, (*Id.* at CDCR 00176), and a recommendation in November 2012 for a discectomy, (*Id.* at CDCR 00162), do not raise genuine disputes of fact regarding his MRI results in December 2010 and whether those results justified the risk of surgery.

111.     Plaintiff was then seen by a physician's assistant on February 7, 2011, regarding his complaints of back pain.  (*Id.* at CDCR 00851.)

112.     An examination of his lumbar spine found paraspinal tenderness and limited range of motion, but a steady gait.  (*Id.*)

113.     The plan was for physical therapy.  (*Id.*)

114.     Plaintiff was seen again for a follow-up on March 17, 2011.  (*Id.* at 00405.)

115.     An examination found that he had localized tenderness in his lower back. (*Id.*)

116.     Plaintiff moved all his extremities well, had full strength bilaterally, was in no acute distress, and could ambulate without deficits.  (*Id.*)

117.     It was noted that he was awaiting physical therapy.  (*Id.*)

118.     A follow-up was ordered.  (*Id.* at 01735.)

119.     On March 23, 2011, Plaintiff had his first physical therapy session.  (*Id.* at

00186.)

120.   Plaintiff would undergo another eight sessions, with the last one being on April 26, 2011.  (*Id.* 00184, 00186.)

121.   By the last session, it was noted that his core mobility was stabilizing.  (*Id.* at 00184.)

122.   On May 4, 2011, Plaintiff was seen by Defendant Manasrah for an update of his medical classification chrono.  (*Id.* at CDCR 00109, 00847.)

123.   Plaintiff complained of chronic lower back pain with no new symptoms.  (*Id.* at CDCR 00847.)

Plaintiff argues that his lack of new symptoms did not mean that his symptoms would not justify neurosurgery/consultation.  Plaintiff's argument does not raise a genuine dispute of material fact, and Plaintiff has provided no evidence that neurosurgery or a neurosurgery consultation was warranted on May 4, 2011.

124.   Plaintiff was found to be in no apparent distress and could ambulate without difficulty.  (*Id.*)

125.   Plaintiff was to return to the clinic in six to eight weeks to check on his lower back.  (*Id.* at CDCR 00847, 01731.)

126.   Plaintiff's prescription for the anti-inflammatory Indocin was refilled.  (*Id.* at CDCR 00847.)

127.   On May 26, 2011, Plaintiff was again seen by Defendant Manasrah regarding his complaints of chronic lower back pain.  (*Id.* at CDCR 00846.)

128.   Plaintiff stated that physical therapy did not help and that he had not been using pain medications for many months.  (*Id.*)

129.   Plaintiff was found to be at "muscular full strength," well developed, and with a steady gait.  (*Id.*)

130.   Plaintiff was in no apparent distress and ambulated well.  (*Id.*)

131.   Plaintiff was diagnosed with chronic low back pain and the plan was to continue with the recommended exercises and have a follow-up in 90 days.  (*Id.*)

Plaintiff argues that a follow-up in 90 days is a long time for someone with chronic back pain and constitutes delay. Plaintiff fails to provide competent evidence to support his argument that 90 days is a long time for someone with chronic back pain and constitutes delay. Plaintiff's opinion, without more, is not sufficient.

132. Plaintiff was again seen by Defendant Manasrah on August 11, 2011. (*Id.* at CDCR 00391.)

133. Plaintiff complained of back pain and stated that the Indocin was not helping much. (*Id.*)

134. Defendant Manasrah discontinued the Indocin and prescribed Tylenol. (*Id.*)

135. Plaintiff was seen again by Defendant Manasrah on October 31, 2011. (*Id.* at CDCR 00376.)

136. Plaintiff complained of suffering from back spasms on and off and that it was getting worse in the cooler weather. (*Id.*)

137. An exam found tenderness in the lower back. (*Id.*)

138. Plaintiff could move all his extremities well, had full strength bilaterally, had a steady gait, and ambulated without difficulty. (*Id.*)

139. Defendant Manasrah diagnosed him with chronic low back pain and prescribed Robaxin, Tylenol and Ibuprofen. (*Id.*)

140. Defendant Manasrah also instructed Plaintiff to avoid strenuous exercise. (*Id.*)

141. Plaintiff saw Defendant Manasrah again on December 6, 2011. (*Id.* at CDCR 00375.)

142. Plaintiff complained of pain in his lower back that radiated mostly to his left lower extremity. (*Id.*)

143. Defendant Manasrah noted that the previous MRI was consistent with mild bulging of the L4-5 disc and herniation of the L5-S1 disk. (*Id.*)

144. An exam found that Plaintiff could move all his extremities well, was ambulatory with a steady gait, and had full strength bilaterally. (*Id.*)

145. Plaintiff was diagnosed with degenerative disc disease with neuropathy (meaning

it affected the nervous system).  (*Id.*)

146.    The plan was for proper exercise, to avoid sleeping on his left side, to avoid standing for long periods of time, and to lose weight.  (*Id.*)

147.    Plaintiff was to have a follow-up in 30 days.  (*Id.* at CDCR 00503.)

148.    Plaintiff had another follow-up with Defendant Manasrah on January 3, 2012. (*Id.* at CDCR 00372.)

149.    Plaintiff complained that the new medication was not very helpful, that the pain was on and off, and that some days were good and some bad.  (*Id.*)

150.    An examination found no change and there was still pain in the mid/lower back. (*Id.*)

151.    There was no swelling or deformities, he had a steady gait, was muscular, and was well-developed.  (*Id.*)

152.    It was noted that Plaintiff had been observed on the yard two weeks earlier engaging in an aggressive workout despite instructions to avoid strenuous exercise and despite Plaintiff's claims that he was unable to do much due to severe lower back pain.  (*Id.*)

Plaintiff contends that he never did aggressive workouts.  However, this assertion is not sufficient to create a genuine dispute of material fact.  Plaintiff does not dispute that he had been observed on the yard two weeks earlier engaging in a workout despite his claims that he was unable to do much due to severe low back pain.

153.    Plaintiff was again diagnosed with degenerative disc disease and chronic lower back pain.  (*Id.*)

154.    Plaintiff was again advised to engage in proper exercise and to stop if it hurt.  (*Id.*)

155.    A follow-up in 60 days was ordered.  (*Id.* at CDCR 00500.)

156.    Plaintiff saw Defendant Manasrah again on January 24, 2012, after a referral from a nurse regarding back pain.  (*Id.* at CDCR 00370.)

157.    Plaintiff stated that the pain is better when he works out.  (*Id.*)

158.    Plaintiff reported no acute symptoms and stated he was still exercising.  (*Id.*)

159.    Defendant Manasrah noted that Plaintiff had been seen on the yard multiple times

doing pushups and playing ball without any deficits.  (*Id.*)

160.   It was also noted that he was laughing and smiling throughout the interview, with no signs of distress, and that he walked about without any deficits. (*Id.*)

161.   Plaintiff was again diagnosed with degenerative disc disease and radiculopathy. (*Id.*)

162.   The plan was to continue current treatment and not engage in strenuous exercise. (*Id.*)

163.   A follow-up in 90 days was ordered.  (*Id.* at CDCR 00497.)

164.   As part of this litigation, Plaintiff's medical history was reviewed by Dr. Barnett, the Chief Medical Consultant for the Receiver's Office of Legal Affairs for the California Correctional Health Care Services.  (Barnett Decl. at ¶¶ 4, 8.)

165.   Dr. Barnett determined that the notes by Defendant Manasrah regarding his medical treatment of Plaintiff indisputably demonstrate careful evaluation and treatment for Plaintiff's condition.  (*Id.* at pp. 13-14.)

166.   There were no impairments described that would make further referral for physician exam necessary nor was there any indication that Defendant Manasrah denied or obstructed Plaintiff's efforts to be seen by anyone else.  (*Id.*)

167.   On February 13, 2012, Plaintiff was seen by a doctor regarding complaints of headaches.  (Ex. A to Ratliff Decl. at CDCR 00365.)

168.   It was noted that he was also suffering from chronic lower back pain.  (*Id.*)

169.   Upon inspection, Plaintiff's back appeared to be normal.  (*Id.*)

170.   There was tenderness to palpation in the L5 area.  (*Id.*)

171.   Plaintiff's range of motion and gait were normal and the plan was for Tylenol #3. (*Id.*)

172.   Plaintiff left KVSP and was transferred to the California Correctional Institution ("CCI"), arriving on February 21, 2012.  (*Id.* at CDCR 00739.)

173.   No surgery was contemplated by Plaintiff's medical providers at CCI until the fall of 2012.  (Barnett Decl. at p. 18.)

174.   On April 2, 2012, Plaintiff was seen by medical staff at CCI regarding his chronic lower back pain.  (Ex. A to Ratliff Decl. at CDCR 00355.)

175.   Plaintiff was diagnosed with lumbar degenerative disc disease that was stable and the plan was to continue present treatment.  (*Id.*)

176.   Plaintiff was seen by a doctor at CCI on May 15, 2012, complaining of chronic low back pain.  (*Id.* at CDCR 00348.)

177.   Plaintiff claimed that the MRIs of his back in 2008 and 2010 could have led to surgery, but that he was transferred before it could be done.  (*Id.*)

178.   Plaintiff asked if a surgical approach could be considered at this point in order to decrease his pain.  (*Id.*)

179.   The doctor noted that Plaintiff could still climb into and out of his upper bunk, had no bladder or bowel dysfunction or knee weakness, and there was no muscle atrophy.  (*Id.*)

180.   The doctor diagnosed Plaintiff with degenerative disc disease and prescribed acetaminophen (Tylenol).  (*Id.*)

181.   On June 6, 2012, Plaintiff was seen by a doctor for his complaints.  (*Id.* at CDCR 00342.)

182.   Plaintiff was diagnosed with degenerative joint disease but it was noted that there was good control and the trend was stable.  (*Id.*)

183.   Plaintiff was informed that he could take Tylenol as needed.  (*Id.*)

184.   On August 15, 2012, Plaintiff had another follow-up with a doctor regarding his back.  (*Id.* at CDCR 00336.)

185.   Plaintiff complained of low back pain and said that he wanted a lower bunk.  (*Id.*)

186.   An examination found that the movements of his spine were normal.  (*Id.*)

187.   Plaintiff was diagnosed with lower back pain under good control with a stable trend.  (*Id.*)

188.   The plan was simply for a follow-up visit.  (*Id.*)

189.   Plaintiff was seen for follow-up at CCI on September 13, 2012.  (*Id.* at CDCR 00637.)

190.    Plaintiff complained of back pain along with numbness going down his left leg to his knee intermittently.  (*Id.*)

191.    Plaintiff also complained that his symptoms were getting worse and that nothing was being done.  (*Id.*)

192.    An examination found that he had full but slow range of motion in his back.  (*Id.*)

193.    Plaintiff was diagnosed with low back pain with left-sided radiculopathy and with worsening symptoms.  (*Id.*)

194.    The examining physician was reluctant to offer surgery without providing maximal medical therapies.  (*Id.*; Barnett Decl. at p. 19.)

195.    Plaintiff was advised of the risks and benefits of surgery and it was suggested that he may want to work with pain medication first before considering surgery.  (Ex. A. to Ratliff Decl. at CDCR 00637.)

196.    Plaintiff was not amenable to this idea.  (*Id.*)

197.    Plaintiff was referred to neurosurgery.  (*Id.*)

198.    This is the first examination of Plaintiff at CCI that considered the possible role of surgery to treat Plaintiff's back pain.  (Barnett Decl. at p. 19.)

199.    A neurosurgery consultation took place on October 4, 2012.  (Ex. A to Ratliff Decl. at CDCR 00177, 00179.)

200.    The plan was for an MRI of the lumbar spine.  (*Id.*)

201.    After the neurosurgery consultation, Plaintiff had a follow-up with a doctor on October 8, 2012.  (*Id.* at CDCR 00632.)

202.    A request was completed for an MRI, as had been advised by the neurosurgeon.  (*Id.* at CDCR 00173, 00469, 00632.)

203.    On October 17, 2012, Plaintiff was transferred from CCI to Valley State Prison ("VSP").  (*Id.* at CDCR 00738.)

204.    Plaintiff was seen by a doctor for an intake on October 23, 2012, and it was noted that he had a history of chronic lower back pain.  (*Id.* at CDCR 00736.)

205.    It also was noted that his MRI would be rescheduled.  (*Id.*)

21

206.    The MRI was performed on October 25, 2012.  (*Id.* at CDCR 00810.)

207.    It was found that, at the L5-S1 disc, there was a central and left-sided large disc extrusion (herniation) with impingement of the left existing nerve roots.  (*Id.*)

208.    It was stated that this appeared to have increased since the MRI conducted in 2010.  (*Id.*)

209.    A consultation with neurosurgery was recommended. (*Id.*)

210.    Plaintiff had a follow-up on November 8, 2012.  (*Id.* at CDCR 00626.)

211.    The plan was for an urgent referral to neurosurgery.  (*Id.*)

212.    Plaintiff underwent a neurosurgery consultation on November 16, 2012.  (*Id.* at CDCR 00163-66.)

213.    It was noted that Plaintiff had a lengthy history of chronic low back pain, but that it had been a lot worse since August 2012.  (*Id.*)

214.     It also was noted that the results of the MRI of 2012 showed that the condition had worsened since the MRI of 2010.  (*Id.*)

215.    It was recommended that Plaintiff undergo a microsurgical discectomy at L5-S1. (*Id.*)

216.    The symptoms that appear to merit surgery at this time did not appear until August 2012.  (Barnett Decl. at p. 21.)

Plaintiff attempts to raise a dispute by arguing that this is a misstatement of the facts because his diagnosis never changed.  However, evidence from the MRI of 2012, the consulting neurosurgeon and medical staff at VSP indicate that Plaintiff's diagnosis changed from disc herniation in 2010 to disc rupture in 2012.  (*Compare* CDCR 00033 (MRI scan of 12/2710 showed possible disk herniation (left posterior focal extrusion) of the L5-S1 disk) *with* CDCR 00159 (MRI scan of 10/25/12 revealed "ruptured disc at L5-S1 on the left side") and  CDCR 00624 (In November 2012, "Pt noted to have lumbar disc rupture").)  Plaintiff also reported worsening symptoms in September 2012.  (*Id.* at CDCR 00637.)

217.    On November 19, 2012, Plaintiff was seen for a follow-up treatment by medical staff.  (*Id.* at CDCR 00624.)

218.   It was noted that Plaintiff had a lumbar disc rupture and that the neurosurgeon had recommended a discectomy.  (*Id.*)

219.   A referral for a discectomy was then written.  (*Id.* at CDCR 00158.)

220.   The surgery was performed on December 21, 2012.  (Ex. A to Ratliff Decl. at CDCR 00213-14.)

221.   There is no evidence that any earlier surgery would have been more effective in treating Plaintiff.  (Barnett Decl. at p. 23.)

222.   The result of the surgery is good and there was no apparent harm that resulted by providing conservative treatment first.  (*Id.* at p. 24.)

**C.   Analysis**

**1.   Plaintiff Has Failed to Present Sufficient Evidence to Establish a Genuine Issue of Material Fact as to his Claim of Deliberate Indifference Against Defendants Lopez and Manasrah**

A prisoner's claim of inadequate medical care does not constitute cruel and unusual punishment in violation of the Eighth Amendment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The two part test for deliberate indifference requires the plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." *Jett*, 439 F.3d at 1096. A defendant does not act in a deliberately indifferent manner unless the defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "Deliberate indifference is a high legal standard," *Simmons v. Navajo County Ariz.*, 609 F.3d 1011, 1019 (9th Cir.2010); *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.2004), and is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm, *Jett*, 439 F.3d at 1096.

In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.1980), citing *Estelle,* 429 U.S. at 105 06. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see also Anderson v. County of Kern*, 45 F.3d 1310, 1316 (9th Cir. 1995). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. *See Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990). Additionally, a prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.1989).

Defendants generally concede that Plaintiff had a medical need with respect to his lower back prior to his arrival at KVSP. (ECF No. 94-2 at pp. 18-19, 21.) Therefore, the court limits its review to whether Defendants Lopez and Manasrah were deliberately indifferent to Plaintiff's lower back condition while he was at KVSP.

Plaintiff primarily appear to argue Defendants Lopez and Manasrah were deliberately indifferent because medical staff at FCC determined that surgery was necessary for his back, that he was then transferred to KVSP in 2009 where the necessary surgery was denied, and that once he was transferred to other institutions in 2012 he received the appropriate care and necessary surgery. However, Plaintiff's initial premise that medical staff at FCC ordered surgery for his back condition is not supported.

In his opposition papers, Plaintiff asserts that "Dr. Hegmann from FCC on 12-8-08 saw Plaintiff and explained the MRI. Ordered neurosurgery/consultation for L5-S1 disc herniation with significant symptoms." (ECF No. 114 at p. 6.) According to the medical records, Dr. Hegmann ordered only a neurosurgery consult for Plaintiff's L5-S1 disc herniation, not surgery. (ECF No. 111, Ex. C to Rapalo Decl.) Defendants' expert, who reviewed Plaintiff's medical records, also opined that the "[t]he reasonable interpretation of the medical record is that Dr.

24

Hegmann was considering a neurosurgical consultation."  UMF38; Barnett Decl. at p. 6.

Plaintiff further attempts to support his claim for a surgery order by citing treatment records from January 2, 2009, prior to his transfer to KVSP.  (ECF No. 114 at p. 6.)  According to the medical records, Plaintiff was seen for follow-up at FCC on January 2, 2009.  At that time, Plaintiff was cleared for transfer and instructed "to let CDC (California) know that he have [sic] disc. herniation and need f/u with neurosurgery."  (ECF No. 111, Ex. D to Rapalo Decl.)  While Plaintiff correctly identifies the instruction regarding follow-up with neurosurgery, this is not an order, or recommendation, for surgery.

Plaintiff also attempts to support his claim for surgery by contending that upon his arrival at KVSP, an Initial Health Screening form dated January 6, 2009, identified "pending surgery." (ECF No. 114 at p. 6; ECF No. 111, Ex. F to Rapalo Decl.).  Although Plaintiff is correct that the initial screening form noted "pending surgery," there is no supporting evidence in the treatment records from FCC demonstrating that back surgery was ordered or scheduled.  At best, the record reflects that a neurosurgery consultation had been recommended by Dr. Hegmann in December 2008.

Based on the undisputed evidence, a reasonable jury could not conclude that Plaintiff was pending back surgery when he arrived at KVSP.  The court now considers whether Defendants were deliberately indifferent to Plaintiff's back issues while at KVSP.

Defendant Manasrah

Defendant Manasrah, a physician's assistant, saw Plaintiff for treatment at least seven times in 2011 and 2012.  On May 4, 2011, the first occasion, Defendant Manasrah saw Plaintiff for an update of his medical classification chrono. Plaintiff complained of chronic lower back pain with no new symptoms.  On examination, Defendant Manasrah found that Plaintiff was in no apparent distress and could ambulate without difficulty. Defendant Manasrah refilled Plaintiff's prescription for Indocin, an anti-inflammatory.  UMF 122-26.

Defendant Manasrah examined Plaintiff again on May 26, 2011, August 11, 2011, October 31, 2011, December 6, 2011, January 3, 2012, and January 24, 2012.  UMF 127-63.  On May 26, Defendant Manasrah found that Plaintiff "muscular full strength," well developed, with

a steady gait, in no apparent distress and ambulating well.  UMF 129.  On August 11, Defendant Manasrah changed Plaintiff's medication in response to his complaint that Indocin was not helping.  UMF133-34.  On October 31, Plaintiff had tenderness in his lower back, but on examination could move all his extremities well, had full strength bilaterally, had a steady gait and ambulated without difficulty.  Defendant Manasrah prescribed Robaxin, Tylenol and Ibuprofen.  UMF 135-39.  On December 6, Defendant Manasrah noted that Plaintiff's earlier MRI was consistent with mild bulging of the L4-5 disk and herniation of the L5-S1 disk.  During examination, Defendant Manasrah found that Plaintiff could move all his extremities well, was ambulatory with a steady gait, and had full strength bilaterally.  Plaintiff was diagnosed with degenerative disc disease with neuropathy, and Defendant Manasrah directed Plaintiff to engage in proper exercises, avoid standing for long periods of time and to lose weight.  UMF 141-46. On January 3, Plaintiff complained that his medication was not very helpful.  An examination showed no change with pain in the mid/lower back.  Plaintiff had a steady gait, was muscular and was well-developed.  Defendant Manasrah noted that Plaintiff had been observed on the yard two weeks earlier engaging in an aggressive workout despite instructions to avoid strenuous exercise and despite Plaintiff's claims that he was unable to do much due to severe lower back pain.  Defendant Manasrah advised Plaintiff to engage in proper exercise and to stop if it hurt. UMF 148-54.  Defendant Manasrah also examined Plaintiff on January 24, 2012.  As with his January 3 examination, Defendant Manasrah noted that Plaintiff had been seen on the yard multiple times doing push ups and playing ball without any deficits.  It also was noted that he was laughing a smiling throughout the interview, with no signs of distress, and that he walked about without any deficits.  The plan was to continue with current treatment and not engage in strenuous exercise.  UMF 156-52.

Based on this record, it is undisputed that Defendant Manasrah responded to Plaintiff's complaints of back pain with medications, exercises and recommendations for certain modifications.  As a result, a reasonable trier of fact could not conclude that Defendant Manasrah was deliberately indifferent to his complaints of back pain.  To the extent Plaintiff disagrees with the treatment provided by Defendant Manasrah for his back issues, including the lack of referral

26

for consultation, such a disagreement is not sufficient to establish deliberate indifference to serious medical needs. *Sanchez*, 891 F.2d at 242.  Moreover, even if Defendant Manasrah were negligent or committed medical malpractice, this is insufficient to support a claim for deliberate indifference.  *See Broughton*, 622 F.2d at 460; *see also Estelle*, 429 U.S. at 106; *Wood*, 900 F.2d at 1334.  Further, Defendant Manasrah has presented undisputed expert testimony that his treatment notes "indisputably demonstrate careful evaluation and treatment for Plaintiff's condition" and "there were no impairments described that would make further referral for physician exam necessary nor was there any indication that Defendant Manasrah denied or obstructed Plaintiff's efforts to be seen by anyone else."  UMF 165-66.  Plaintiff has not provided contradictory expert testimony to raise a genuine issue for trial regarding Defendant Manasrah's treatment of Plaintiff or that his condition required a further referral, including a neurological consult.

In his opposition, Plaintiff contends that Defendant Manasrah would not listen to him about his previous care and "[o]nly stated to the Plaintiff he was faking it." (ECF No. 114 at p. 11.)   Plaintiff also argues that Defendant Manasrah left his chronic lower back pain "virtually untreated."  (*Id.* at 20.)  These arguments are unsupported by the record.  It is undisputed that Defendant Manasrah repeatedly treated Plaintiff's back condition, including prescribing pain relieving medications.  For instance, Defendant Manasrah initially prescribed Indocin, which was discontinued in response to Plaintiff's own complaints, and then prescribed Tylenol.  UMF 126, 134.   Defendant Manasrah later added Robaxin and Ibuprofen after finding tenderness in Plaintiff's lower back.  UMF 137, 139.  Additionally, Defendant Manasrah cautioned Plaintiff to avoid strenuous exercise, avoid standing for long periods and to lose weight.  UMF 131, 140, 146, 154, 162.  Defendant Manasrah's response to Plaintiff's complaints does not lead to a reasonable inference that he left Plaintiff's condition virtually untreated or that Defendant Manasrah believed that Plaintiff was "faking" it.   In fact, Defendant Manasrah provided treatment to Plaintiff despite repeated observations of Plaintiff on the yard engaging in exercise, including doing push ups and playing ball without deficits.  UMF 152, 159.

Plaintiff also contends that Defendant Manasrah "found the same symptoms Plaintiff's

1   other Health Care Providers found that warranted referral to neurosurgery/consultation."   (ECF

2   No. 114 at p. 17.)   To support this argument, Plaintiff argues that his repeated complaints of

3   lower back pain were the reason that doctors at FCC, CCI and VSP ordered referral to

4   neurosurgery/consultation.   However, Defendant Manasrah has presented undisputed expert

5   testimony that there were no impairments described in Defendant Manasrah's progress notes that

6   would have made a further referral necessary.[4]   UMF 166.   Additionally, any disagreement

7   between Defendant Manasrah in 2011 and 2012 with a physician's order from three or four years

8   earlier, in 2008, recommending a neurosurgery consult, does not demonstrate deliberate

9   indifference to a serious medical need.   At best, it establishes a difference of medical opinion

10   between prison medical staff regarding the course of treatment for Plaintiff at different times,

11   which does not give rise to a constitutional violation.   *Sanchez*, 891 F.2d 240, 242 (9th Cir.

12   1989).

13        In order to establish that this difference of opinion amounted to deliberate indifference, or

14   that an alternative course of treatment should have been pursued, Plaintiff must "show that the

15   course of treatment the doctors chose was medically unacceptable under the circumstances" and

16   that "they chose this course in conscious disregard of an excessive risk to [the prisoner's]

17   health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).   Here, Plaintiff has not

18   presented any evidence demonstrating that the course of treatment that Defendant Manasrah

19   chose was medically unacceptable or that it was chosen in conscious disregard of an excessive

20   risk to Plaintiff's health.   As noted, the undisputed expert testimony is that, at the time of

21   Defendant Manasrah's treatment, Plaintiff did not have any impairment that would have made a

22   further referral for a physician exam necessary.  UMF 166.

23        Plaintiff appears to suggest that Defendant Manasrah was deliberately indifferent to his

24   medical needs because a neurosurgery consult and surgery were ordered after he was transferred

25   from KVSP.   Plaintiff's suggestion is not sufficient to support an inference that he required a

26   neurosurgery consult or surgery during the period of Defendant Manasrah's treatment.   UMF

27   
28

---

[4]     It also could reasonably be inferred by a trier of fact that Plaintiff's condition was not as severe as alleged given that he was repeatedly seen exercising on the yard, doing push ups and playing ball without deficits.  UMF 152, 159.

166.   More importantly, it is undisputed that a neurosurgery consult was not ordered until September 13, 2012, which was eight months after he had last been seen by Defendant Manasrah, and only after his condition had worsened.   UMF 189-97.   Indeed, the consulting neurosurgeon indicated that Plaintiff's back pain had been worse since August 2012, which was several months after his transfer from KVSP.   UMF 213.   Further, Defendant Manasrah has presented expert testimony that the symptoms that appeared to merit surgery did not appear until August 2012 and that there is no evidence that any earlier surgery would have been more effective in treating Plaintiff.   UMF 216, 221.

To the extent Plaintiff contends that Defendant Manasrah's conservative care caused further injury, Plaintiff cites no supporting expert opinion or medical evidence supporting the view that conservative care caused further injury.   Moreover, Dr. Barnett, in reviewing the results of Plaintiff's eventual surgery, concluded that the result of surgery was "good" and that "[n]o apparent harm has resulted by providing conservative treatment first."   UMF 222.

When considering the undisputed events detailed above, a reasonable jury could not conclude that Defendant Manasrah was deliberately indifferent to a serious medical need in violation of the Eighth Amendment. Therefore, the court recommends granting Defendant Manasrah's motion for summary judgment on that basis.

Defendant Lopez

According to the undisputed facts, Defendant Lopez was the Chief Medical Officer at KVSP, did not provide direct patient care and never saw Plaintiff for treatment.   UMF 85-86. Instead, Defendant Lopez reviewed and responded to Plaintiff's inmate appeal, partially granting it at the second level of review.   UMF 84.

Generally, liability is not imposed on a chief medical officer whose sole act was to review medical appeals.   *See, e.g., Vasquez v. Tate*, 2013 WL 1790143, at *8 (E.D. Cal. Apr. 26, 2013), *citing Koch v. Neubarth*, 2009 WL 4019616, at *5 (E.D. Cal. 2009).   However, a medically-trained individual who is made aware of serious medical needs through reviewing a prisoner's appeal may be liable for failure to treat those needs.   *See, e.g., Thomas v. Nangalama*, 2013 WL 1281792, at *7 (E.D. Cal. Mar. 26, 2013) (prisoner's evidence raised triable issue of

fact as to whether medical doctor was made aware of alleged ongoing suffering through prisoner's grievance); *see also Pogue v. Igbinosa*, 2012 WL 603230, at *9 (E.D. Cal. Feb. 23, 2012) ("emerging consensus, therefore, is that a medically-trained official who reviews and denies an appeal is liable under the Eighth Amendment when a plaintiff can show that the official knew, at least in part, from reading the appeal that the plaintiff had a serious medical issue and nevertheless chose not to offer treatment").  Therefore, the court considers whether Defendant Lopez knew from Plaintiff's appeal that he had a serious medical issue and chose not to offer treatment in violation of the Eighth Amendment.

According to the undisputed facts, Plaintiff complained in his appeal that he was not afforded the opportunity to request an MRI to determine the extent of the degenerative disc disease that he had and that he needed pain medication.  UMF 87.  Defendant Lopez reviewed Plaintiff's medical chart, which showed that Plaintiff had been prescribed the anti-inflammatory Ibuprofen and the muscle relaxant Robaxin.  UMF 88. Defendant Lopez therefore granted this portion of Plaintiff's appeal.  (Ex. A. to Ratliff Decl. at CDCR 00019-20.)  With respect to the MRI, Defendant Lopez noted that an x-ray had been ordered by Dr. Huang, but an MRI had not been found medically warranted by treating physicians at KVSP.  (*Id.*); UMF 89.  In response to Plaintiff's request for surgery, Defendant Lopez also denied this request because there was no indication in Plaintiff's medical chart that surgery was medically indicated at that time.  UMF 90.  Because none of Plaintiff's treating physicians at KVSP had recommended Plaintiff be considered for surgery, Defendant Lopez would have had no reason to offer surgery.  UMF 91.

Plaintiff has failed to show a genuine issue of material fact that the denial of an MRI and surgery amounted to deliberate indifference on the part of Defendant Lopez.  Defendant Lopez had a right to rely on the judgment of Plaintiff's treating physicians, who did not find an MRI or surgery necessary to address Plaintiff's condition at that time.  *See*, *e.g.*, *Coats v. Kimura*, 2013 WL 76288, at *20 (E.D. Cal. Jan. 4, 2013) (reviewers of prisoner's medical appeal were entitled to rely on prisoner's treating physicians), *findings and recommendations adopted*, 2013 WL 1325792 (E.D. Cal. Mar. 30, 2013).  Moreover, Plaintiff has not shown that the treatment he was provided, which included an x-ray, pain medication and a muscle relaxant, were medically

unacceptable.  In contrast, expert testimony shows no evidence that surgery prior 2012 would have been more effective in treating Plaintiff.  UMF 221.

When considering the undisputed facts detailed above, a reasonable jury could not conclude that Defendant Lopez was deliberately indifferent to a serious medical need in violation of the Eighth Amendment.  Therefore, the court recommends granting Defendant Lopez's motion for summary judgment on that basis.

### 3. Defendants Lopez and Manasrah Are Entitled To Qualified Immunity

Defendants Lopez and Manasrah also move for summary judgment on the basis of qualified immunity.

Qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When considering an assertion of qualified immunity, the court makes a two-pronged inquiry: (1) whether the plaintiff has alleged the deprivation of an actual constitutional right and (2) whether such right was clearly established at the time of defendant's alleged misconduct.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 535 U.S. 94, 201 (2001)).

As noted above, the court finds no deprivation of a constitutional right.  Therefore, Defendants Lopez and Manasrah are entitled to qualified immunity, and the court will recommend that summary judgment also be granted to Defendants Lopez and Manasrah on the ground of qualified immunity.

### III. Conclusion and Recommendation

Based on the foregoing, IT IS HEREBY RECOMMENDED that:

1. Plaintiff's unauthorized surreply (ECF No. 122) be stricken from the record;

2. Defendants Lopez and Manasrah's motion for summary judgment (ECF No. 94) be granted.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within

**fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." The parties are advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

    Dated:   __**March 8, 2017**__          _____/s/ *Barbara A. McAuliffe*_____
                                           UNITED STATES MAGISTRATE JUDGE